Our second case of the morning is ACF 2006 against Devereux. Mr. Fischer Good morning, Honorable Court, Honorable Judges. My name is Jim Fischer, and I am the attorney who represents the Beals, who are the intervenors in this case. The Beals were clients of Mr. Conower, whose settlement funds were stolen by him in 1996. They intervened in this action when we learned that there were some $2 million in attorney fees, some portion of which belonged to Mr. Conower, that were available to satisfy judgments and to satisfy the claims of creditors. There was a lawsuit pending in which a loan company was suing the successor counsel to the Conower firm, seeking to use those proceeds, Mr. Conower's portion of those proceeds, to satisfy their commercial debt. And it was our belief that the claims of the victims, whose settlement funds had been embezzled by Mr. Conower, had a priority over subsequent commercial transactions. We filed a complaint in this matter. Ms. Alton Yes, Your Honor. Mr. Fischer, thank you. I know that you rely on Indiana Code Section 23.1.52-7 as authority to pierce the veil of Mr. Conower's professional corporation. Were you able to find any case law to support your position in that regard? Mr. Fischer Only what the statute itself says, I did not. Ms. Alton Yeah, okay, thank you. Mr. Fischer There is another issue, though, with respect to the piercing of the corporate veil. I'm not sure it's necessary to pierce the veil, because the unfaithful trustee statute first looks to whether the proceeds that were embezzled could be traced and followed. We believe that they can be, and that they can be traced and followed to Mr. Conower's firm. Indeed, it was the firm who received the funds, it was the firm who made the annual payments of the annuity, and in his sentencing statement, Mr. Conower acknowledged that his use of embezzled funds had been for the maintenance of his law practice. So we believe that we can, in fact, trace these funds not to Mr. Conower directly or personally, but to his law firm. His law firm— Mr. Conower Is his law firm a party in this litigation? Mr. Fischer No, but the funds— Mr. Conower Isn't that a problem? Mr. Fischer I don't believe so, because the—well, I'm sorry, his—I'm sorry, I believe his law firm is a party in this litigation. It was his law firm whose claim is the basis of both ACF's claim and ours. It is only the funds that were owed out of the settlements as attorney fees to the Conower law firm that are subject to—the subject matter of the claim to the creditors. But you can't—under the unfaithful trustee statute, if you can trace the funds, simply changing the corporate structure of your entity doesn't insulate you. The fact that Mr. Conower, who was a sole practitioner, incorporated himself as a single-person corporation doesn't extinguish or prevent us from continuing to follow those funds that he continued to use in his law practice. So we believe that under either the language of the statute that says that an attorney can't affect the rights of clients as against the attorney by incorporating, that also the unfaithful trustee statute allows us to follow those funds through any changes that he makes in the formal corporate structure of his law firm. We think our claim attaches to those funds. Now, Mr. Fischer, if we agree with you that the Beals were improperly dismissed from the case at summary judgment, then what is your view with respect to the trial and the judge's findings as to the percentage of fees that should be allocated from the Devereux firm to the Conower firm? Does the district court have to go back to square one at that point with your clients back in the case? You know, I hope not, just as a practical matter. The amount of the Beals' lien is smaller than the $775,000 judgment. It's something around or a little under $500,000. So it really isn't significant to us whether that amount is higher or lower. We would not request or urge a retrial of that issue if, in fact, our lien is the first priority because it's simply not relevant to our clients. Then they would collect their lien from the existing judgment. So I would hope that simply as a practical matter that could be avoided. I don't know what the situation is, frankly, or what the court would need to do if there's a determination that our lien is valid but is either pro rata with or behind some amount of lien on ECF's part because then potentially the size of the judgment of the allocation of fees would be relevant to our client's ability to collect. But I think as a practical matter, the court certainly should look to avoid having to have a retrial of the issue of the court's allocation of fees. That allocation, I might have found a higher number, but I think it was within the range of the evidence. So we're not pushing for a retrial of that except for four cases. Of the 14 cases, four were separated out and an agreement was reached between ACF and Mr. Devereux that on those four cases Mr. Devereux would get to keep the fees. We didn't make that agreement, don't agree with that agreement. We can't think of a theory under which Mr. Devereux is entitled to Mr. Conower's portion of the fees on those four cases. The reason stated for it was because those four clients also had money stolen by Mr. Conower. But those clients aren't the ones who are seeking the money, it's Mr. Devereux who wants the money paid to him. His clients aren't parties to this litigation and haven't made a claim. So because there's been no allocation of the fees on those four cases and we believe we have a lien as to those fees that's primary because advocate or ACF has waived its claim as to those four, that we would require an allocation of the fees in those, or a determination in those four cases alone. Does that answer your question? I'm not going to talk very much about the adequacy of the complaint. I think we've said everything that's to be said about it. There is one point that I would draw the court's attention to, I'm not sure how clear it was. I don't think this court has ever required legal theories to be pled, rather it is factual allegations that show the cause of action that are to be pled. But if you look at the, draw your attention to the prayer for relief, number five, where we specifically ask as part of our relief for all other statutory and common law remedies, and I believe that that is more than sufficient to leave the complaint open-ended with respect to the potential existence of additional statutory claims, such as the unfaithful trustee statute. Do you have a figure on how much DeVeals actually received before all of this happened, because he was making, I guess, annual distributions supposedly under what he was, he didn't put together, I don't even know whether it's supposed to be a third party that did put together whatever the trust agreement was, or whatever the endowment was, or whatever they were calling it. Yes, that certainly needs to be factored in. They did receive some number of years worth of annuity payments, but the way the annuities were structured, there was a long delay in the beginning of the annuities, particularly as to Kristen, I don't think her first annuity check was for ten years. So there wasn't a lot of hers paid, much more so as to the annuity that went to the parents, which did begin immediately. But yes, we would agree that those payments are something that has to be factored into the damage calculation. But of course, we didn't get to that point in the trial because of the summary judgment ruling. I don't know whether the court wants me to talk about the affidavits, and probably not, but I will explain something about the procedure, which I thought was quite strange in terms of the court's striking of the affidavits. The court decided to deal with three inconsistent factual declarations from Mr. Myers by simply striking two of them and ignoring the inconsistency among them. While maybe the court could have done that if nothing else happened, something else did happen. We filed a motion with the court asking the court to strike all three of the affidavits based upon the fact that they were all mutually inconsistent and appeared to be fabricated. We think that put the issue squarely before the court. We asked the court the alternative to strike all the affidavits since they were inconsistent and therefore couldn't be reliable, or in the alternative, to find that the existence of an issue of the credibility of Mr. Myers should result in the summary judgment being denied. That motion to strike was denied, but the issue, I think, was placed squarely before the court, and I think the court had to react to the inconsistency of the affidavits in determining whether questions of fact existed with respect to the existence of any assignment that would give ACF a right to pursue a claim for a loan that was actually made by a different entity.  That's all I have at the moment. Thank you, Mr. Fisher. Thank you. Good morning. Mr. Devereaux. Yes. Thank you very much. I am Timothy Devereaux. I am appearing on behalf of myself, Timothy Devereaux, as well as Mark C. Ladendorff, attorney at law, which was operating under the name of Ladendorff Law Firm. In this appeal, there were approximately 11 cases that the court did a quantum merit division of attorney's fees, which is called for under Indiana law. When an attorney leaves a firm and cases go with him, the courts have said in Indiana that the attorney's fees are to be divided under an equitable theory of quantum merit. The court is supposed to look at the amount of work that was done at each specific firm and then compare those and come to a conclusion as to appropriate division of the attorney's fees. In this case, we've only appealed two of the division fees on two of the cases. There were originally 21 cases that came over with me when I went from the Kornhauer Law Firm to the Ladendorff Firm, and then out of those cases, 16 were actually resolved. Several were lost on summary judgment or for other reasons. And then out of that 16, 11 ended up with settlements that were subject to a division of attorney's fees. The two cases that we're here to talk about today are the RS case, which involved the death of a toddler who died in a bunk bed. It was a claim that we brought on a product liability basis. It was a design defect case. What was important in that case is that after Mr. Devereaux, myself, had resigned his employment with the Kornhauer Firm and went to the Ladendorff Firm, the senior partner at the Kornhauer Firm, Mr. Kornhauer, stepped in and began doing some work on the RS case. What he did was he settled with one of the primary defendants for the small sum of $20,000. He then went to the family and said that out of this $20,000, I'm keeping $8,000 of it for attorney's fees, and I'm keeping the other $12,000 to pay case expenses. The problem there was that he did not pay the case expenses, and in particular, there was one case expense that was critical that he did not pay, and it was the plaintiff's liability expert in that case. It was a lady by the name of Shelly Depa. She was a very highly qualified expert who had worked with the Consumer Product Safety Commission, so she was the expert to be used on this case. Unfortunately, Mr. Kornhauer never paid her fees. After repeated attempts to get paid, she made multiple requests. At some point, she finally said, I'm done. I'm not working on this case anymore. When the clients learned that Mr. Kornhauer was going to be criminally charged, they decided to leave the firm and contacted me to take the case over. When I began to work on the case, I contacted Ms. Depa and was informed by her that she had no interest whatsoever in continuing on with the case at all. The problem that that presented was that the deadline for experts had already passed. Now, the reason this is all important to the case is because in Indiana, the Quantum Merowith Division of Attorney's Fees is an equitable claim for relief. Even the Indiana Supreme Court, when they acknowledged in the case of Galanis v. Lyons that the attorney's fees are to be done through this equitable procedure, it said it only applies if both the client and the attorney are free from fault. The court then, in other cases in Indiana, have said, if you come into equity, the first thing you have to have is clean hands. If you don't have clean hands, you cannot seek equitable relief. In this case, Mr. Kornhauer and on his behalf, ACF, are in here seeking a portion of the The problem with his settlement was twofold. I've talked about the fact that the expert absolutely refused to go on with the case because of non-payment, but the other problem was the remaining defendants drew the conclusion that since one of the primary other defendants was released for $20,000, the case had no value. So when we took over the case at Leydendorf Law, we had a very difficult time convincing the remaining defendants that the case did possess value, and through our efforts, we were able to get the case scheduled for mediation. We prepared, we had, actually there were another instance of misconduct of Mr. Kornhauer that I think bears on the case, and that is even after he was notified that our firm was going to be taking over the case from him, he refused to turn over the case file or the physical evidence in the case, which was the bunk bed. We had to go and get a court order from the court in our case, ordering him to turn over the documents and the evidence, the case file. He refused to do so. We ended up having to go in with the sheriffs forcibly into his office to take physical possession. He did everything in his power to prevent this case from moving forward. It is hard to believe that under a quantum Merowith theory and approach that requires a party to have clean hands, that the court can find that Mr. Kornhauer is now entitled to an additional $120,000 out of the subsequent settlement that was procured only through the efforts of myself and the Leyden Dorf Law Firm. So we believe that when you look at the Indiana case- All of this, counsel, sounds like the arguments you make to the trier of fact at a trial. Yes. And of course, there was a trial. Yes. And the trier of fact resolved these issues against you. What legal error was committed? You're in a court of appeals. Yes, your honor. The point is that there was no evidence to refute this testimony, and that's what's important is at trial, the only witnesses that were called were myself, Mr. Devereux, Mr. Leyden Dorf, and an attorney by the name of Randy Jergensen that talked about the referral fees and co-counsel fees of some of the other cases. But the only witnesses that were called at trial to address any of these issues were myself and Mr. Leyden Dorf. There was no- So at the bottom of all this, at the bottom of all this, what do you think about the fee allocation issue if we agree that the bills were improperly dismissed from the case at summary judgment? Well the amount of attorney's fees in this case that are to be divided between the bills or between ACF, depending on how this court rules, is all subject to whether or not Mr. Konauer is entitled to recover the attorney's fees. Because we have to remember that these are attorney's fees that are being claimed by Mr. Konauer, and then after those get to Mr. Konauer, they will either be divided to ACF or to the bills. So the fact is that if Mr. Konauer is barred from seeking the attorney's fees because of his misconduct, then that bars the recovery in the first instance, and then there is no issue between the bills or ACF. His own conduct would be a bar to the recovery of the fees in the RS case. Is there any cash anywhere? Is there cash in escrow or- Sure. We're talking about a lot of money shipping around. Is there any money available? If you're talking about the actual attorney's fees generated from this case, it's all being held in our trust account, Your Honor. Okay. How much is that? A little over, I think it was 2.1 million or it might be 2.4 million. All right. That's what I need to know. So it's not a hypothetical. These are all funds that somebody's trying to get a hold of. Right. These are funds we've collected through attorney's fees. We have held them in trust during the pendency of this suit. That brings us to one of the other issues in the case is those funds are being held in an Indiana IOLT account, which is required under Indiana's law and attorneys have to maintain a trust account and all of the interest from the trust account goes to the Indiana Bar Foundation and the attorneys don't get the interest off the trust accounts. Well, in this case, the judge at the very end of the case tacked on an order into a final order awarding prejudgment interest in this case. Well, the problem with that is ACF never pled or sought prejudgment interest from myself and Mr. Leydendorf. No evidence was presented at trial regarding prejudgment interest and there's simply no way to calculate it because some of these settlements occurred after this litigation began. Was that interest being paid, basically post-judgment interest to the fund, whatever, what is it? The money that goes into the account, all interest from the trust account goes straight to the Bar Foundation. So the interest has already been collected? Collected and paid to the Indiana Bar Foundation. And paid out. And paid out. That's your point. Yes, absolutely. Paid out. So we believe that the court overlooked the clear fact that Mr. Conower does not have clean hands when it comes to the RS settlement. With respect to interest, it may be that there's no technical waiver or forfeiture, but why didn't you file a Rule 59 motion and ask the district court to fix what it did? Generally, one wants to get things right in the district court rather than leave them wrong and complain to a court of appeals. We understand that. We knew we were coming up on the other issues as well. This was clear error and it's going to affect the awards because the awards that were appealing, these two cases make up over approximately 90% of the total award. That's what was frustrating for us is that we had an instance where the court agreed with us on 9 out of 11 of the cases with regard to the division of attorney's fees and then chose two cases in which she entirely awarded 90% of the attorney's fees that ACF was seeking. I wanted to touch upon the LB case because that one makes up by far the vast majority of the award here. On the LB case, if you look at the evidence that was presented at trial, it is clear that the overwhelming amount of work that was done on the LB case was done at the Leyden Dorr firm. The court only focused on five activities when it made its ruling to divide the attorney's fees. The judge determined that Mr. Conower and ACF were entitled to 40% of the attorney's fees generated from the LB case. To support that, they pointed to five different activities. Those activities, when you look at them, simply do not support any conclusion that that represents 40% of the amount of work on the case. Importantly, the LB case originated, it began at the Leyden Dorr firm and it was referred to the Conower firm. It was only at the Conower firm for about 10, 10 and a half months. When I left the Conower firm and went to the Leyden Dorr firm, the LB case came back with me because I was the attorney who had been working on the case. I was the only attorney that worked on the case at both the Leyden Dorr firm and at the Conower firm. The evidence at trial was very clear. There was documents and exhibits produced identifying what tasks were performed on the LB case while it was at the Conower firm and what events were done while it was at the Leyden Dorr firm. The vast majority of the work was done at the Leyden Dorr firm. One of the things we pointed to from an objective standpoint was the expenses. The case expenses incurred at the Conower firm on the LB case were only $2,700. The case expenses incurred in preparing the case at the Leyden Dorr firm were close to $35,000. At the time the LB case left the Leyden Dorr firm, not the Leyden Dorr firm, left the Conower firm, liability had not been established. There was no idea because what's important, if you look at the file, three weeks before the case, the LB case left Conower and went to Leyden Dorr, the Conower firm filed an expert disclosure in which they conceded that the expert in the case could not identify any defect in the product because no testing had been done yet. No testing had been done yet because the product itself hadn't been turned over to the Conower law firm. So the case was at an extremely nascent stage. There was simply very little that had been done and one of the things the court pointed to was she said that a settlement demand letter was submitted by the Conower firm while the case was being handled by them. That was a court-required settlement statement, statement of damages, and it was only two and a half pages long. It had no identification of any defect in the product nor did it have any detailed description of the injuries. It was five short paragraphs about he was injured. This was his immediate medical treatment. Well, you're the key witness in all of this. Yes, I am. And I assume you explained all that to the district court, right? Well, we thought we had. We thought we had because the evidence was so overwhelming that that's why we're here today. We can't understand where she came up with the percentages that she chose because the five activities she focused on are literally the only activities that the Conower firm engaged in during the ten months. And I believe my time is up. Do you have any questions? You have a little bit left when you come back. All right, thank you. Thank you, Mr. Devereaux. Mr. Jones. Good morning. It pleases the court, Roger Jones on behalf of ACF 2006 Court. Mr. Jones, you were your client technically, got this case underway. So I've got a practical question, which is, why is this not a bankruptcy? All the arguments that all the parties are making are the arguments we would expect to be made in a bankruptcy proceeding of Conower personally or his law firm. Why is this not a bankruptcy? Your Honor, I cannot tell you why, Mr. Conower. Certainly you can tell me. You didn't file a bankruptcy proceeding. You can file involuntary bankruptcy proceedings, and you chose not to. May I respond to that? So you can answer my question. Well, there are two ways a bankruptcy case could have been filed. Mr. Conower and or the Conower firm could have filed a bankruptcy case. I can't speak to why they, I think I can speculate as to why they did not, but I don't know that for a fact. As to why we did not file an involuntary petition, Your Honor, under the bankruptcy code, one, you have to be an unsecured creditor in order to file an involuntary petition or participate in an involuntary petition. Secondly, and we were a secured creditor, secondly, Your Honor, you have to have three if the debtor has more than 12 creditors, which in this case, Mr. Conower and his firm had a plethora of creditors. So we alone, as a secured creditor, could not file an involuntary petition, Your Honor, either under Chapter 7 or Chapter 11. Mr. Jones, you know, we have case after case that says you don't have to plead a legal theory in the complaint. And if you plead the wrong one, that does preclude you from relying on a different one in a motion to dismiss or for separate judgment. So I would appreciate your explaining to me why it wasn't error for Judge Pratt to say that the Beal Intervenors were stuck with the legal theory they cited in their complaint. Two answers to that, Your Honor. First, the theory set forth in the complaint, it's not just that it's an alternative theory or it's not just that they didn't cite a legal statute. They set expressly in their complaint the basis on which they claimed an interest in these legal fees. Recall they were an intervenor asserting an interest in specific assets. The specific assets belong to the Conower Law Firm, LLC, which was organized in 2007, Your Honor, and I'll come back to why that's important. That's an alternative ground of decision, but it's not a defense of the district court's view that complaints have to plead law. I don't think the district court's view was that it had to plead law. The district court said so. I think the district court said so. It's part of the opinion. You don't have to defend errors by district courts when you've got an alternative ground, and perhaps that's where you want to rest your arguments. I'd be happy to proceed to the alternative ground. The alternative ground, Your Honor, is the court also looked at the merits. On the motion to reconsider, the court looked at the merits of the Beal's claim and, again, granted summary judgment to ACF with respect to that claim. And so let's talk about those merits for a moment. The complaint that was filed was, to say the least, skinny. Very few factual allegations. The evidence that was offered by the Beals in connection with the motion for summary judgment consisted of basically two things, an unverified complaint filed in the state court against Mr. Conower personally and a general partnership called the Conower-Dorman Law Firm. Not the Conower Law Firm that held these assets, but a different law firm. So it's an unverified complaint and a copy of a default judgment entered against Mr. Conower personally and the Conower-Dorman Law Firm. That's it. That's the entire evidence offered by the Beals in connection with the motion for summary judgment. As we set forth in our response to that, Your Honor, an unverified complaint, the fact that it was filed, the court can take judicial notice of that, but the allegations contained in that complaint have no evidentiary effect, don't satisfy the requirements of being like an affidavit or competent evidence in connection with a Rule 56 motion. The second thing they filed was a default judgment. Again, it's a default judgment. It had no res judicata or collateral estoppel effect against anyone and certainly not against ACF. So when you look at the motion for summary judgment, the Beals had zero evidence in the record in support of their claim. Zero. Nothing. Again, motion for summary judgment. Two, on the merits, what the court found is that the Indiana lien statute did not apply here to afford the Beals a lien against assets of the Conower law firm for the simple reason that that statute says nothing more than if there is an embezzlement or commingling of funds by a trustee, that the beneficiary of that trust is entitled to a lien on personal assets of the trustee, in this case, Mr. Conower. It's a lien on his personal assets. There's nothing in that statute that would extend that lien to assets of any entity or corporation that he owns. Instead, that lien statute would have given the Beals a lien on Mr. Conower's equity in his law firm, the Conower law firm that was formed in 2007. Maybe it gives them a lien on that. But that would be the equity. ACF was a creditor of the Conower law firm, and its claim gets paid before that equity. And so, the court ruled on the merits that that lien statute did not apply. Do you have a question, Your Honor? No. Oh, I'm sorry. Moreover, if we take a look at what they're claiming, there's no connection between the lien claim that they purport to assert. The embezzlement of funds occurred in 1996. In 1996, Mr. Conower was a member of the firm called Conower Dorman Law Firm, not the Conower firm that was established in 2007. The allegation was that he took those funds in 1996 and invested those in his law firm. Well, his law firm was not the Conower law firm. It was another entity entirely, Conower law firm not established until 10 years later. So when Mr. Conower testified at his sentencing hearing that he had taken funds from clients and invested them in the Conower law firm, if you read that testimony, it was during the period 2005 to 2007 that he testified to that. And so there's no evidence in the record whatsoever that there's any connection between those funds that were embezzled in 1996 and these assets, nothing. There's absolutely nothing in the record. The Beals argue that tracing might be appropriate here, but there is also no evidence in the record that would permit tracing. They never offered any evidence to show any connection between what happened in 1996 and the assets of the Conower law firm in 2015. Well, there was never any annuity set up, but is that right? There never was any annuity. If we look at the record, your honor, all we know is that there was a complaint filed alleging that no annuity was set up and a default judgment entered. That's what we know. The complaint alleged that no annuity was set up, but there's nothing in the record to support that. Judge Rovner. Thank you. I want to ask you about the transfer agreement between Advocate and ACF. Regardless of the dust up over the electronic gate stamps on that agreement, the signatures on the two different versions of the agreement that were submitted to the court seem to me to be different. And I don't see any explanation for that in your brief. Can you tell us how the signatures could legitimately be different if this is the same document? There is no evidence in the record for me to speak to in terms to explain that to the documents and affidavits were stricken and we were not permitted to respond to those things. There's nothing in the record that I can speak to, your honor, that would answer your question. If the court would like me to provide an explanation that's not in the record, I'd be happy to do that, but there's nothing in the record. Well, we can't go outside the record, can we? I don't believe so, your honor. Those were stricken. We did not get a chance to respond to these allegations in the court below. And so, there's nothing in the record that I can point the court to that would answer that question. Suffice it to say, your honor, with respect to the assignment issue, it's a red herring. What we're talking about here is a parent company assigning a loan to a wholly owned subsidiary, doing business in the same place, with the same corporate officers, so forth and so on. The initial affidavit was from the chief credit officer of both entities, both the parent and the subsidiary, and his affidavit said that the parent had assigned the loan to the subsidiary. Forgive me, but I'd like to go back a bit, because even if Mr. Meyer's declaration might have sufficed by itself, in the first instance, to establish that Advocate transferred its interest under the loan to ACF, once these different versions of the transfer agreement came to light, wasn't there now a question of fact that had to be resolved about whether the transfer agreement was genuine, and thus, whether there actually was a transfer in 2008, as Mr. Meyer had affirmed? At the very least, there are discrepancies here that should be cleared up, don't you think? I don't believe so, your honor. First and foremost, there's no requirement under the law anywhere that there be a written assignment of a loan like this from a parent to a subsidiary. Throughout the case below, the Beals argued not about Mr. Meyer's personal knowledge. Their argument was that as a matter of law, an assignment of a loan cannot occur without a written assignment document. They confused Article 9's requirement for a valid security interest, a security agreement must be in writing, with the requirements for an assignment of a loan in a security agreement. There's absolutely no requirement whatsoever for there to be a writing from advocate to ACF. This whole issue with respect to whether there was a writing or not is an entire red herring. No writing is required, and the Beals cannot point to any authority anywhere that would have required such a writing. Well, what do you say about that India and a code section 23, et cetera, which the Beals construed to mean that you should pierce the veil of an attorney's professional corporation when he's breached his fiduciary duty to the client by commingling or stealing his client's money, for example? I guess I would say several things, Your Honor. I believe that statute is intended, as in almost every state or in every state, that a lawyer cannot insulate himself from malpractice liability or liability to the client by incorporating just because the fee agreement is with Conower Law Firm, LLC, does not insulate the lawyer, Mr. Conower, from liability to the client. It does not speak at all to piercing the corporate veil of a corporation formed by an attorney. Two, if we also look at the Hostman case in the Indiana statute, you'll find that this is not a super priority lien. To the extent they had a lien, it was subject to anybody who's a good faith transferee would take free and clear of that lien. What you would have here, Your Honor, is if you permit this lien to attach to assets of a corporation, then you've created a secret lien that no one loaning money to any law firm could ever know about. That lien would arise from something that happened 10 years ago. A lender comes in, does its diligence, makes a loan to the law firm only to find out that there is a lien that's been created 10 years ago. I don't think that was the intent with respect to pierce the corporate veil. I don't think that was the intent with respect to the statute regarding self-incorporation or with respect to the lien statute because it would wreak havoc in the markets. No one could loan money to a law firm in the state of Indiana because there could be a secret lien out there that there's no way it could know about. That's why that lien statute also has a good faith transferee provision, which says if you take for value in good faith, then you take your lien as senior. In this case, there's no question that advocate took without notice, there's no evidence presented that it had any notice at all of what had happened to the Beals in 1996. It took without notice, so it's a good faith transferee regardless of whether the lien attached. Thank you, counsel. Thank you. Anything further, Mr. Fisher? Mr. Jones indicated that there is no requirement of a written document to make an assignment and that's not true. One of the documents submitted by ACF was a copy of the sale agreement by which advocates sells loans to its subsidiaries. That document required a written loan transfer document to evidence the sales. So while there may not be a statute that makes such a requirement, advocate made such a requirement and that certainly creates an issue of fact when advocate says in writing that it must have a written agreement to transfer a loan to a subsidiary and no written document is produced. That creates a question of fact of whether that assignment took place. With respect to the unfaithful lien statute and the good faith purchaser, I would note that advocate is not plaintiff here, ACF is. ACF did not qualify under the savings provisions of the unfaithful trustee statute because they did not take for value nor did they take without notice of the claim. According to ACF, the documents they submitted, the transfer agreement that they submitted, they paid zero to acquire this loan, it was simply transferred to them and that acquisition didn't take place until 2013 at a time when Mr. Conower had already been arrested and pled guilty to the embezzlement of funds. So they took for no consideration and they took with knowledge of the facts that would create these liens. I don't think they qualify for that exception. And finally, I want to note Mr. Devereux's comments that he should be allowed to, well that Mr. Conower's bad acts should enter into this equation. I agree Mr. Conower did bad acts, but I'm having trouble with the concept that because Mr. Conower did bad acts, Mr. Conower's portion of the fees should be given to Mr. Devereux. That's the part that we object to. Mr. Conower should forfeit his fees, but he should forfeit to his victims, not to, as a windfall, to the attorney, his associate that handled the case after his departure. That's all I have. Thank you very much. Counsel, the case is taken under advisement. The court will take a brief break before the third case this morning.